# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| JOSEPH J. MESSINA, | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Civil Action No. 3:15-cv-01790 (VLB) |
| | : | |
| CAROLYN W. COLVIN, | : | |
| COMMISSIONER OF SOCIAL | : | February 6, 2017 |
| SECURITY, | : | |
| Defendant. | : | |

## RULING ON THE PLAINTIFF'S MOTION TO REVERSE AND THE DEFENDANT'S MOTION TO AFFIRM THE DECISION OF THE COMMISSIONER

This is an administrative appeal following the denial of the Plaintiff, Joseph Messina's, application for disability insurance benefits ("DIB").[1]  It is brought pursuant to 42 U.S.C. §§ 405(g).

Joseph Messina ("Plaintiff" or "Messina") has moved for an order reversing the decision of the Commissioner of the Social Security Administration ("Commissioner"), or remanding the case for rehearing.  [Dkt. No. 15.]  The Commissioner, in turn, has moved for an order affirming the decision.  [Dkt. No. 16.]

---

[1]  Under the Social Security Act, the "Commissioner of Social Security is directed to make findings of fact, and decisions as to the rights of any individual applying for a payment under [the Act]."  42 U.S.C. § 405(b)(1).  The Commissioner's authority to make such findings and decisions is delegated to administrative law judges ("ALJs").  C.F.R. §§ 404.929 *et seq.*  Claimants can in turn appeal an ALJ's decision to the Social Security Appeals Council.  20 C.F.R. §§ 404.967 *et seq.*  If the appeals council declines review or affirms the ALJ opinion, the claimant may appeal to the United States District Court. Section 205(g) of the Social Security Act provides that "[t]he court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."

For the following reasons, Messina's Motion for an Order Reversing or Remanding the Commissioner's Decision [Dkt. No. 15] is DENIED, and the Commissioner's Motion to Affirm that Decision [Dkt. No. 16] is GRANTED.

I.   **Factual Background**

The following facts are taken from the parties' Joint Stipulation of Facts ("Joint Stipulation") [Dkt. No. 21] unless otherwise indicated.

a.  <u>Plaintiff's Background</u>

Messina was born in 1968.  [Dkt. No. 21 at 43.]  He graduated from college with a degree in accounting.  *Id.*  He worked as an accountant for four years and stopped because the "very professional environment . . . wasn't the environment [he] felt comfortable in."  [Dkt. No. 7-3 at 32-33.]  Messina then opened and ran a restaurant from 2006 to May 10, 2008, the alleged onset date of his disability. [Dkt. No. 21 at 43.]  He was last insured on December 31, 2008.[2]  *Id.*  On July 30, 2012, Messina applied for a Period of Disability and Disability Insurance Benefits. [Dkt. No. 7-6 at 157].  On September 12, 2012, a disability adjudicator in the Social Security Administration denied his initial request for disability benefits and thereafter denied his request for reconsideration.  [Dkt. No. 7-5 at 69-73.]

On May 6, 2014, Messina appeared (with counsel) for a hearing before an Administrative Law Judge ("ALJ").  [Dkt. No. 7-3 at 27.]  On June 9, 2014, the ALJ

---

[2]  **In order to be entitled to disability benefits, a plaintiff must "have enough social security earnings to be insured for disability, as described in § 404.130." 20 C.F.R. § 404.315(a)(1); *see also Brockway v. Barnhart*, 94 F. App'x 25, 27 (2d Cir. 2004) (noting a claimant's eligibility for Social Security disability insurance benefits terminates on the claimant's date last insured).**

issued a decision denying benefits. *Id.* at 7.   On September 30, 2015, the appeals council denied Messina's request for review of that decision thereby making the ALJ's decision the final decision of the Commissioner. *Id.* at 1.   This appeal followed.

      **b.  Plaintiff's Medical History**

            **i.  Messina's automobile accidents and early medical treatment**

Messina was involved in an automobile accident on May 10, 2008,[3] and was transported via emergency helicopter to Hartford Hospital.  [Dkt. No. 21 at 1; Dkt. No. 7-8 at 548.]  The emergency trauma team diagnosed Messina with left radial ulnar dislocation, rib fractures, pulmonary contusion, possible splenic kidney laceration, fixed fracture, left elbow dislocation, and thoracic spine tenderness. *Id.*  The trauma team also found Messina was intoxicated.  *Id.*

On May 12, 2008, Dr. Evan Fox, a hospital psychiatrist, evaluated Messina's mental health.  [*Id.* at 3; Dkt. No. 7-8 at 556.]  Messina told Dr. Fox he experienced mood fluctuations and depression.  *Id.*  Messina denied suicidal ideation and stated his anxiety was relieved with medication prescribed by Dr. Timothy Fignar, his primary care physician, as well as marijuana and alcohol.  *Id.*  Dr. Fox noted Messina seemed agitated and angry, but that his thought processes were logical and coherent.  *Id.*

---

[3] Medical records refer to Messina's involvement in two automobile accidents in close succession in May 2008, both involving the use of alcohol.  [Dkt. No. 7-8 at 363.]  The record does not indicate the timing and severity of the other May 2008 accident.

Messina was discharged on May 13, 2008 with prescriptions for pain medications, muscle relaxers and antidepressants.  [Dkt. No. 21 at 3; Dkt. No. 7-8 at 571-575.]

Messina met with Dr. Fignar on May 16 and again on May 30, 2008.  [Dkt. No. 7-8 at 363, 368.]  Dr. Fignar gave Messina a mental health screening questionnaire which suggested a likely bipolar diagnosis and suggested Messina see a psychiatrist.  *Id.* at 363.  Dr. Fignar also offered Messina a handout discussing depression, instructed him to exercise and avoid depressants including alcohol, and adjusted Messina's anxiety medication.  *Id.*

An orthopedist, Dr. Robert Belniak, examined Messina on June 3, 2008.  [Dkt. No. 21 at 5; Dkt. No. 7-8 at 282.]  Dr. Belniak found Messina experienced a 20 degree extension loss in his elbow, some chronic low back pain with radiation to the lower leg, and some impingement symptoms in his left shoulder, although an X ray of Messina's shoulder was normal.  [Dkt. No. 7-8 at 282.]  Dr. Belniak prescribed an anti-inflammatory and physical therapy.  *Id.*  Messina benefitted from physical therapy, and when he saw Dr. Belniak on July 1, 2008, his left shoulder and left elbow had improved.  *Id.* at 281.  However, Messina's lower back pain continued.  *Id.*  Dr. Belniak referred him to a spine specialist and prescribed him Vicodin.  *Id.*

Also on July 1, 2008, Messina was in a motorcycle accident.  [Dkt. No. 7-8 at 368.]  He was admitted to New Britain Hospital, where x-rays revealed several fractures, although the physician could not fully discern which were caused by his May 2008 accident rather than his July 2008 accident.  *Id.*  Messina

4

complained of pain, swelling, redness, numbness, weakness, and difficulty breathing. *Id.* Messina was prescribed an anti-inflammatory and a pain reliever. *Id.* After his July 2008 accident, Messina saw a number of physicians for shoulder pain, mental health, and lower back pain. Messina's medical history pertaining to each condition is discussed in turn below.

ii. Messina's Shoulder Pain

On July 25, 2008, an MRI revealed a tear of the anterior superior glenoid labrum in his right shoulder. [Dkt. No. 21 at 10; Dkt. No. 7-8 at 266.] On October 22, 2008, Dr. Belniak performed an arthroscopic labral reconstruction operation to repair the tear. [Dkt. No. 21 at 13; Dkt. No. 7-8 at 289-90.] One week after his surgery, on October 28, Messina reported "the previous pain he was having [in his right shoulder] is gone." [Dkt. No. 7-8 at 277.] Dr. Belniak noted Messina was "able to move the shoulder without much discomfort" and instructed Messina to practice "gentle range of motion exercises." *Id.*

On November 18, 2008, Dr. Belniak found Messina had "good early range of motion of his shoulder with minimal pain under shoulder level." [Dkt. No. 7-8 at 276.] Dr. Belniak prescribed physical therapy and restricted Messina from heavy lifting. *Id.*

On December 16, 2008, Dr. Belniak found Messina had full overhead range of motion and would "gradually resume his normal activities." [Dkt. No. 7-8 at 275.] Messina reported his "pain has largely gone away." *Id.*

5

### iii.  Messina's Mental Health

On August 1, 2008, Messina returned to Dr. Fignar for continued mental health treatment.  [Dkt. No. 7-8 at 370.]  Messina reported his "feelings of being up and down [were] mostly resolved with treatment" and he was "finding enjoyment in life in general and [had] no further disturbances in sleep or appetite [and] denie[d] suicidal ideation."  *Id.*  Dr. Fignar instructed Messina to continue exercising and avoiding "alcohol and other depressing[4] drugs," and made no adjustments to his mental health medications.  *Id.*

Through the remainder of the relevant time period, Messina routinely reported no depression or only mild symptoms.  [*See, e.g.*, Dkt. No. 7-8 at 372 (September 23, 2008 report to Dr. Fignar that Messina's antipsychotic medication was working well); *id.* at 231 (December 1, 2008 medical notes from Dr. Patel, Messina's pain management specialist, recording Messina's depression level at two out of ten); *id.* at 376 (December 16, 2008, medical notes from Dr. Fignar indicating Messina's "excellent response" to his antipsychotic medication).]

### iv.  Messina's Spine Condition

On July 16, 2008, Messina saw an interventional pain management physician, Dr. Roshni N. Patel, who found Messina had radiculopathy affecting his left leg, limited mobility, mild tenderness and spasms in his lower back.  [Dkt. No. 21 at 7; Dkt. No. 7-8 at 253-58.]  Dr. Patel advised Messina to attend physical

---

[4] A depressant is defined as "a drug or other agent that slows the activity of vital organs of the body.  Depressants acting on the central nervous system include general anesthetics, opiates, alcohol, and hypnotics."  *Depressant Definition*, Encyclopedia Britannica, https://www.britannica.com/science/depressant (last viewed Feb. 6, 2017).

therapy for sciatica, continue taking pain medication prescribed by Dr. Fignar, and use a local anesthetic targeting his rib fracture pain. *Id*. Dr. Patel's treatment improved Messina's sciatica. [Dkt. No. 7-8 at 280.] By July 29, Messina experienced intermittent sharp pains that were worse when bending, but overall experienced a "good benefit" from physical therapy. *Id*. at 251.

On July 18, 2008, Messina met with Dr. Robert Pepperman, a physical medicine and rehabilitation specialist. [Dkt. No. 21 at 8; Dkt. No. 7-8 at 291-92.] Dr. Pepperman conducted an electrodiagnostic study of Messina's lower limbs, which revealed normal results inconsistent with peripheral neuropathy or lumbar radiculopathy or myopathy. [Dkt. No. 7-8 at 292.] Dr. Pepperman denied Messina's request for a prescription for Percocet, finding it medically unnecessary. *Id*.

On July 29, 2008, Dr. Patel examined Messina and found no limitation in his range of motion due to radioculopathy, no motor weakness or sensory loss, the ability to raise his right leg more than 60 degrees and his left leg 40 degrees. [Dkt. No. 21 at 11; Dkt. No. 7-8 at 252.] Dr. Patel prescribed additional numbing patches to treat his chest pain. *Id*.

On October 30, 2008, Dr. Patel examined Messina and reported limited range of motion due to radiculopathy, moderate tenderness, and mild sensory loss. [Dkt. No. 7-8 at 245.] On November 4, 2008, Dr. Patel treated Messina's sciatica with epidural steroid injections. *Id*. at 244, 246.

On November 3, 2008, Messina had an MRI of his lumbar spine which revealed normal alignment, degenerative disc disease, and degenerative facet

7

hypertrophy (degeneration of joints along the back of the spine).  [Dkt. No. 21 at 16; Dkt. No. 7-8 at 228-30.]

On November 12, 2008, one week after his epidural steroid injections, Messina reported a pain level of five, decreased from seven.  [Dkt. No. 7-8 at 236.] Messina reported sciatic pain in his left buttock and left leg occurring for one to two hours every morning.  *Id.*  Messina stated his pain was managed with Vicodin.  *Id.*  Dr. Patel examined Messina and found a limited range of motion due to his radiculopathy, mild tenderness and spasms, and improved ability to raise his leg.  *Id.* at 237.  Dr. Patel prescribed physical therapy and an anti-inflammatory.  *Id.*  On November 18, 2008, Dr. Patel administered additional epidural steroid injections.  [Dkt. No. 21 at 20; Dkt. No. 7-8 at 235.]

On December 1, 2008, Dr. Patel recorded Messina's sciatic pain level between eight and ten out of ten.  [Dkt. No. 21 at 21; Dkt. No. 7-8 at 231.]  Dr. Patel noted Messina's continued limited range of motion due to radiculopathy, moderate tenderness and spasms, mild sensory loss, and ability to raise his left leg 40 degrees.  *Id.* at 232.  Overall, Dr. Patel found Messina's performance was consistent with normal activity with effort and some signs or symptoms of disease.  *Id.* at 233.  Dr. Patel referred Messina to Dr. William H. Druckemiller, a spine and neurological surgery specialist.  *Id.*

On December 12, 2008, Dr. Druckemiller evaluated Messina and noted he had symptoms consistent with "radiculopathy that has partially cleared."  [Dkt. No. 261.]  He instructed Messina to start a back exercise program and noted that if Messina failed to improve, "surgery might become a consideration."  *Id.* at 262.

8

### v. Messina's medical history after the relevant time period

Dr. Fignar continued prescribing Messina pain medications, muscle relaxants, and anti-inflammatories after December 31, 2008, the close of the relevant time period.  [Dkt. No. 21 at 27-28; *see also, e.g.*, Dkt. No. 7-8 at 396 (pain medication prescribed for left leg and back pain February 2009); 408 (muscle relaxer prescribed for left leg and back pain August 2009); 415 (pain medication prescribed for back and shoulder pain December 2009); 442 (pain medication prescribed for back pain February 2010); 451 (pain medication prescribed for back pain May 2010); 506 (pain medication prescribed for back pain January 2011); 544 (pain medication prescribed for back pain July 2012); 647 (pain medication prescribed for "chronic pain" May 2013).]  Dr. Fignar prescribed Messina pain medication sixty-seven times in the five and two-half year period between January 2009 and March 2014.  [Dkt. No. 21 at 27-28; Dkt. No. 7-8 at 391-99; 401-02, 405, 407, 409-10, 415, 440, 442, 444, 447, 450-51, 453, 455-57, 461-62, 506, 508-09, 511-13, 515, 517, 520-21, 523, 525, 527, 531, 534-36, 542-43, 547, 635, 637, 640, 643-44, 646-47, 650, 652-54, 676-78, 680-82.]

On February 4, 2010, Messina complained of persistent knee pain "since his accident a year and a half ago, which has gotten much worse on the right side recently."  [Dkt. No. 7-8 at 274.]  On March 1, 2010, Dr. Belniak operated on Messina's right knee, repairing a tear of the lateral meniscus.  *Id*. at 287.  On March 9, 2010, Messina reported his right knee pain had subsided.  *Id*. at 272.  A postoperative exam revealed Messina's range of motion was good, neurovascular condition was normal, and the incision site looked healthy.  *Id*.

9

On January 5, 2011, Messina reported left-side knee pain that felt "identical to the pain he experienced when he had his right meniscal tear taken care of." *Id.* at 271.  On January 19, 2011, Dr. Belniak operated on Messina's left knee to repair a large tear in his medial meniscus. *Id.* at 287.  On January 28, 2011, Messina reported his left knee pain was gone. *Id.* at 270.  A postoperative exam revealed the same level of success Messina experienced with his right knee surgery the prior year. *Id.* at 270.

On October 10, 2011, an MRI of Messina's lumbar spine revealed mild spondylosis (degeneration of the spinal column).  [Dkt. No. 21 at 36; Dkt. No. 7-8 at 603-04.]  On December 5, 2011, Dr. Jeffrey Bash, a spinal surgery specialist, performed spinal surgery to correct Messina's degenerative condition.  [Dkt. No. 21 at 37; Dkt. No. 7-8 at 594.]  After the surgery, on December 11, 2011, Messina reported he was "thrilled," and that "his leg pain, numbness, and weakness [were] resolved."  [Dkt. No. 7-8 at 602.]  A post-operative examination showed a well-healed incision, no evidence of infection or tenderness, "5/5 grade strength," and fully intact neurological and vascular systems. *Id.*  As of November 2012, Messina continued to report he felt "much better than prior to surgical intervention," and that he is able to address any residual pain with a lower dosage of medication than he was taking before the procedure. *Id.* at 605.

On February 25, 2014, Dr. Belniak surgically addressed advanced degeneration of Messina's left knee which he had preliminarily detected in February 2011.  [Dkt. No. 7-8 at 659 (February 2014 surgery); *Id.* at 269 (February 17, 2011 treatment notes finding "some degenerative changes" which "may need

10

surgery in the future").]  By April 10, 2014, Messina was regaining left knee motion with physical therapy and managing residual pain with medication.  *Id.* at 663.

   c.  Expert Examinations and Opinions

   Dr. Bash, a spine surgeon, began treating Messina some time in 2011.  [*See* Dkt. No. 7-8 at 581-82.]  On July 23, 2012, Dr. Bash completed a "Medical Source Statement of Ability to do Work-Related Activities."  *Id.* at 664-69.  In the statement, he rendered an opinion that Messina's limitations rendered him unable to work as of May 10, 2008.  *Id.* at 669.  Dr. Bash did not indicate the particular medical or clinical basis for his findings, however as Dr. Bash was Messina's spine surgeon, the Court deduces that Messina's diagnosed limitations were due to his spinal condition.  *Id.* at 669.

   Dr. Bash assessed that Messina could occasionally lift or carry up to 20 pounds, could sit, stand, or walk for up to 30 minutes at a time, could sit for a total of one hour in an eight-hour workday, stand for three hours, and walk for two hours, with breaks to lay down for one hour in between those activities.  *Id.* at 665.  He found Messina could not walk a block at a reasonable pace on rough or uneven surfaces.  *Id.* at 669.  In addition, Dr. Bash found Messina could push or pull with either hand occasionally and could reach, handle, finger, or feel with either hand continuously.  *Id.* at 666.  He found Messina could operate foot controls continuously with either foot, climb stairs or ramps and balance occasionally, and could never climb ladders or scaffolds, stoop, kneel, crouch, or crawl.  *Id.* at 666-67.  Dr. Bash found Messina could never tolerate unprotected

11

heights or moving mechanical parts, but could frequently operate a motor vehicle, tolerate humidity or wetness, dust, odors, fumes, pulmonary irritants, extreme heat or cold, and vibrations.  *Id.* at 668.  He found Messina could tolerate moderate noise.  *Id.* at 668.

Dr. Jay Cudrin, a psychologist, [5] completed a social security questionnaire on August 8, 2012. [Dkt. No. 7-8 at 312.]  Dr. Cudrin found Messina has an adjustment disorder currently in remission.  *Id.*  Dr. Cudrin assessed that Messina's mood is expansive and affect is appropriate, that his judgment and insight are adequate, and that he is fully oriented.  *Id.* at 312-13.  Limitations arising from Messina's disorder include slight problems interacting with others appropriately in a work environment, asking questions or requesting assistance, respecting others in authority, and getting along with others without distracting them or exhibiting behavioral extremes.  *Id.* at 313-14.  Dr. Cudrin also noted Messina "has a strong sense that he knows as much of not more than most people around him."  *Id.* at 314.

Dr. Firooz Golkar, a State agency physician, also reviewed the record evidence from the relevant period and gave an assessment of Messina's limitations.  [Dkt. No. 21 at 40; Dkt. No. 7-4 at 53.]  Dr. Golkar found three medically determinable impairments: a degenerative disorder of the back, major joint dysfunction, and affective disorder.  [Dkt. No. 7-4 at 52.]  Messina's back

---

[5] Messina asserts Dr. Cudrin treated Messina for his mental health conditions, however the Court notes the only record evidence involving Dr. Cudrin is the four-page questionnaire he completed in August 2012.  [Dkt. No. 1 at 4 (listing Dr. Cudrin as a treating source).]

12

pain and bilateral shoulder pain left him with the ability to occasionally lift or carry up to 50 pounds, frequently lift or carry up to 25 pounds, stand, walk, or sit up to 6 hours in an 8-hour workday, and push or pull (including operation of hand or foot controls) for an unlimited period.  [Dkt. No. 7-4 at 54.]  In addition, Dr. Golkar assessed that Messina could frequently climb ramps or stairs, balance, kneel, crouch, or crawl, but could only occasionally climb ladders, ropes, or scaffolds, or stoop.  *Id.*  Dr. Golkar found Messina was limited in his ability to reach overhead.  *Id.* at 54-55.  Dr. Golkar opined that Messina could perform his past relevant work as an accountant.  *Id.* at 56.

Supplementing Dr. Golkar's opinion, Dr. Hedy Augenbraun, a State agency psychologist, reviewed the record evidence from the relevant period and assessed Messina's psychological limitations.   [Dkt. No. 21 at 40; Dkt. No. 7-4 at 52.]  Dr. Augenbraun found Messina's affective disorder mildly restricted his daily activities, ability to maintain social functioning, and ability to maintain concentration, persistence or pace.  *Id.*  Dr. Augenbraun found Messina's psychological limitations non-severe.  *Id.* at 53.

Finally, Dr. Jeanne Kuslis, another State agency physician, reviewed the record evidence from the relevant period and assessed Messina's limitations.  [Dkt. No. 21 at 41; Dkt. No. 7-4 at 63.]  Dr. Kuslis identified three medically determinable impairments: a degenerative disorder of the back, major joint dysfunction, and affective disorder.  [Dkt. No. 7-4 at 63.]  She found Messina's back pain and bilateral shoulder pain limited his exertional ability to occasionally lifting up to 20 pounds, frequently lifting up to 10 pounds, standing, walking, or

sitting up to 6 hours in an 8-hour workday, and unlimited pushing or pulling (including operation of hand or foot controls).  *Id.* at 63-64.  In addition, Dr. Kuslis found Messina could frequently climb ramps or stairs, balance, kneel, crouch, or crawl, and could occasionally climb ladders, ropes, or scaffolds, or stoop.  *Id.* at 65.  Dr. Kuslis also found Messina was limited in his ability to reach overhead.  *Id.* In addition, Dr. Kuslis found Messina should avoid concentrated exposure to vibration and hazards such as machinery and heights.  *Id.* at 66.  Like Dr. Golkar, Dr. Kuslis found Messina could continue his past relevant work as an accountant.  *Id.* at 67.

     d.  <u>The Hearing Before the ALJ</u>

On May 6, 2014, Messina appeared (with counsel) for a hearing before an ALJ.  [Dkt. No. 7-3 at 27.]  Messina testified that he last worked in 2008, running his own restaurant.  *Id.* at 34.  He closed his restaurant in May 2008 because he "didn't have anybody capable of running it" and was unable to continue running it himself after his first automobile accident.  *Id.*

Messina testified that he lived with his wife and two daughters until October 1, 2012, when he and his wife divorced.  *Id.* at 40.  Since that time, Messina has lived with his father.  *Id.*

Living with his father, Messina cooks, cleans the dishes and does laundry.  *Id.*  Otherwise, Messina lays in his bed watching television in the morning, sits on his couch watching television with his father in the afternoon, and goes on walks when the weather permits.  *Id.* at 41.  He estimates he lays on his back 75 percent of each day because it "takes the pressure off of [his] back" and minimizes his

14

pain. *Id*. at 43.  Messina leaves his home occasionally to visit a friend or go to
doctor's appointments. *Id*. at 41.  He does not jog, run, or lift due to his back
pain. *Id*. at 42

Messina stated his pain "comes and goes." *Id*. at 41.  At times, Messina
can sit, stand, or walk without pain, but other times those activities cause pain
that "could last five minutes [or] could last an hour." *Id*.

Messina's mental health medication makes him tired, and makes him feel
like a "zombie." *Id*. at 42.  In addition, Messina states he has dealt with anger
issues since his automobile accidents, which he tries to control with medication,
and that his anxiety makes him nervous and "unable to focus." *Id*.

### e. The ALJ's Decision

On June 9, 2014, ALJ Ryan Alger issued a decision concluding Messina
was not disabled within the meaning of the Social Security Act from May 10, 2008
(the alleged disability onset date) through December 31, 2008 (Messina's date last
insured).  [Dkt. No. 7-3 at 10.]

ALJ Alger determined Messina suffered from severe impairments including
degenerative disc disease with L5 radiculopathy and disc bulge. *Id*. at 12.  In
addition, ALJ Alger recognized that Messina "has a history of depression," but
found "no convincing evidence" in the record that Messina's mental health
constituted a severe impairment. *Id*. at 13.  In support of that finding, ALJ Alger
explained that "no physician or other acceptable medical source of information
had restricted the claimant's activities [due to his mental health] in such a way as
to preclude him from performing basic work activities." *Id*. at 13.  In addition, ALJ

15

Alger cited Dr. Cudrin's opinion that Messina had only a "slight problem" with daily functions. *Id.* at 13 (citing Dkt. No. 7-8 at 312-15). ALJ Alger also gave "great weight" to non-treating physician Dr. Kuslis's conclusion that Messina had no severe psychiatric impairment during the relevant period. *Id.* at 13.

Regarding Messina's shoulder condition, ALJ Alger noted Messina had a right shoulder labrum tear and was status post arthroscopic repair on October 20, 2008. *Id.* However, ALJ Alger found no record evidence that any limitations related to the labrum tear lasted for 12 consecutive months as required under the social security regulations,[6] as the tear improved after the October 2008 surgery. *Id.* at 14 (citing Dkt. No. 7-8 at 275 (medical report dated December 16, 2008 stating "patient reports that his pain has largely gone away. . . The patient has full overhead range of motion at this point"). Accordingly, ALJ Alger concluded Messina's right shoulder tear was not a severe impairment during the relevant time period. *Id.* at 12-14.

The ALJ also concluded Messina had no impairment or combination of impairments that met or equaled one of the listed impairments in the social security regulations. *Id.* at 14. ALJ Alger "especially considered" listing 1.02, which describes major dysfunction of a joint. *Id.* However, as discussed above, he found the surgical repair of Messina's right shoulder labrum tear on October 20, 2008 corrected Messina's range of motion and largely resolved his pain. *Id.*

---

[6] 20 C.F.R. 404-1505(a) defines disability as "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."

ALJ Alger also gave great weight to Dr. Kuslis' opinion that Messina did not meet the listed impairment requirement under the social security regulations. *Id.*

Having found no listed impairments, ALJ Alger next evaluated Messina's residual functional capacity ("RFC") and found he was capable of the full range of light work during the relevant time period. *Id.* at 15. ALJ Alger assessed the medical record from the relevant time period[7] and concluded Messina's right shoulder labrum tear, mental health conditions, and spinal condition were all treated such that Messina "regained the ability to perform the full range of light work by December 31, 2008." *Id.* at 17. In support of that finding, ALJ Alger emphasized a December 12, 2008 medical record from Dr. Druckemiller, Messina's spinal specialist, indicating Messina's back and left leg pain from his May 2008 accident was still present but had "gradually improved." *Id.* (citing Dkt. No. 7-8 at 259-60). Dr. Druckemiller noted that by December 12, 2008 Messina was fully alert, in no acute distress, with a normal gait, mild restricted range of motion of the back, and normal strength and coordination in the lower extremities by the close of the relevant time period. *Id.* ALJ Alger also reiterated that Messina's right shoulder labrum tear resolved after his October 2008 surgery, and that there was no record evidence establishing that Messina's mental health limited his ability to perform basic work activities during the relevant period. *Id.* at 13, 17.

---

[7] The ALJ also reviewed Messina's medical history after 2008, but noted it was "not relevant in the present matter since he must establish that he was disabled prior to the date [the insurance requirements of the social security regulations were] last met of December 31, 2008." *Id.*

17

ALJ Alger also considered Messina's own characterization of his symptoms but found Messina "not generally credible with respect to his statements concerning the intensity, persistence and limiting effects of his symptoms," when viewed in light of the objective evidence and Messina's conflicting statements. *Id.* ALJ Alger explained he found Messina's statements inconsistent with medical records indicating that by December 2008 he had regained significant functioning, experienced less pain, had no or minimal depression, and was projected to gradually resume normal activities. *Id.* (citing elsewhere in his decision Dkt. No. 11-8 at 262 (December 12, 2008 medical record), 275 (December 16, 2008 medical record)).  ALJ Alger also noted Messina's hearing testimony contradicted itself, as he stated his pain "comes and goes" but also stated he spends up to 75 percent of each day laying down due to pain. *Id.* Messina's statements regarding his condition also contradicted an Activities of Daily Living questionnaire he completed in August 2012 indicating a "relatively high level of functioning." *Id.* While ALJ Alger recognizes the questionnaire is beyond the relevant time period, he deduces from it that Messina "retains a relatively high level of functioning despite his allegations of severe physical [and] mental functional limitations." *Id.* at 19.

ALJ Alger also considered medical source's opinions regarding Messina's limitations as part of the RFC analysis.  In particular, ALJ Alger gave Dr. Bash's report "some weight," but remained "persuaded that the claimant could perform the full range of light work within the relevant period."  *Id.*  In contrast, ALJ Alger afforded "significant weight" to Dr. Kuslis' opinion regarding Messina's

limitations during the relevant time period, which allowed for longer periods of daily standing, walking, and sitting than Dr. Bash's report. *Id.* at 18. His evaluation of each report was based on Messina's medical records indicating his condition improved by December 31, 2008. *Id.* (citing Dkt. No. 7-8 at 275 (December 16, 2008 progress report)).

After considering Messina's medical history during the relevant time, self-assessment, and physician opinions regarding his limitations, ALJ Alger concluded Messina retained the ability to perform light work from May 2008 through December 2008. *Id.*

Based on Messina's RFC, ALJ Alger determined that, during the relevant period, Messina could perform his past relevant work as either an accountant (sedentary skilled work) or a restaurant manager (light skilled work). *Id.* In addition, the ALJ stated there were other jobs in the national economy Messina could have performed during the relevant period, given his age, education, work experience, and RFC, but the ALJ did not list any of those other jobs. *Id.* at 19-20.

## II.   Standard of Law

The Social Security Act establishes that benefits are payable to individuals who have a disability.  42 U.S.C. § 423(a)(1).  "The term 'disability' means . . . [an] inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . ."  42 U.S.C. § 423(d)(1).  In order to determine whether a claimant is disabled within the meaning of the SSA, the

ALJ must follow a five-step evaluation process as promulgated by the Commissioner.[8]

   A person is disabled under the Act when their impairment is "of such severity that he is not only unable to do his previous work but cannot . . . engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A).  "[W]ork which exists in the national economy means work which exists in significant numbers either in the region where such individual lives or in several regions of the country." *Id*.[9]

   "A district court reviewing a final . . . decision [of the Commissioner of Social Security] pursuant to section 205(g) of the Social Security Act, 42 U.S.§ 405(g), is performing an appellate function."  *Zambrana v. Califano*, 651 F.2d 842

---

oul[8]  The five steps are as follows: (1) The Commissioner considers whether the claimant is currently engaged in substantial gainful activity; (2) if not, the Commissioner considers whether the claimant has a "severe impairment" which limits his or her mental or physical ability to do basic work activities; (3) if the claimant has a "severe impairment," the Commissioner must ask whether, based solely on the medical evidence, the claimant has an impairment listed in Appendix 1 of the regulations. If the claimant has one of these enumerated impairments, the Commissioner will automatically consider him disabled, without considering vocational factors such as age, education, and work experience; (4) if the impairment is not "listed" in the regulations, the Commissioner then asks whether, despite the claimant's severe impairment, he or she has the residual functional capacity to perform his or her past work; and (5) if the claimant is unable to perform his or her past work, the Commissioner then determines whether there is other work which the claimant could perform. The Commissioner bears the burden of proof on this last step, while the claimant has the burden on the first four steps. 20 C.F.R. § 416.920(a)(4)(i)—(v).

[9]  The determination of whether such work exists in the national economy is made without regard to: 1) "whether such work exists in the immediate area in which [the claimant] lives;" 2) "whether a specific job vacancy exists for [the claimant];" or 3) "whether [the claimant] would be hired if he applied for work."  *Id.*

(2d Cir. 1981).  "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, [are] conclusive . . . ."  42 U.S.C. § 405(g).  Accordingly, the Court may not make a *de novo* determination of whether a plaintiff is disabled in reviewing a denial of disability benefits.  *Id.*; *Wagner v. Sec'y of Health & Human Servs.*, 906 F.2d 856, 860 (2d Cir. 1990).  Rather, the Court's function is to ascertain whether the Commissioner applied the correct legal principles in reaching his conclusion, and whether the decision is supported by substantial evidence.  *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987).  Therefore, absent legal error, this Court may not set aside the decision of the Commissioner if it is supported by substantial evidence.  *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982).  If the Commissioner's decision is supported by substantial evidence, that decision will be sustained, even where there may also be substantial evidence to support the plaintiff's contrary position.  *Schauer v. Schweiker*, 675 F.2d 55, 57 (2d Cir. 1982).

The Second Circuit has defined substantial evidence as "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).  Substantial evidence must be "more than a scintilla or touch of proof here and there in the record."  *Williams*, 859 F.2d at 258.

III.   Discussion

Messina's Motion to Reverse contains only a recitation of his medical record without commentary or argument.  [Dkt. No. 15.]  However, his Complaint

lists particular grounds for challenging the ALJ's decision, and the Court interprets the Motion to Reverse as incorporating those arguments.  [Dkt. No. 1.] The issues presented in Plaintiff's Complaint are whether: (A) the ALJ appropriately weighed the opinions of Messina's treating physicians and non-treating sources; (B) the ALJ erred in his RFC analysis by failing to properly evaluate Messina's symptoms; and (C) the ALJ's determination that Messina had the residual functional capacity to perform light work and sedentary work is contradicted by the medical opinions in the record.  [Dkt. No. 1.]

The Court discusses Messina's objections in turn below.

### a. Whether the ALJ appropriately weighed the medical opinions in the record

Messina's first argument, styled argument "A," asserts the ALJ should have given more weight to his treating physicians' opinions than to non-treating State agency medical consultants, and that the ALJ should have better explained the basis for his weight determination.  [Dkt. No. 1 at 4.]  Relatedly, Messina's argument "C" asserts the ALJ's determination that he had the residual functional capacity to perform light work and sedentary work is contradicted by his treating specialists' opinions.  [Dkt. No. 1 at 10.]  In support of his position, Messina asserts the ALJ should have credited the opinion of treating physician Dr. Bash, which asserts greater limitations than other medical opinions in the record.  *Id*. at 11-12.  Messina's arguments "A" and "C" both question whether ALJ Alger gave appropriate weight to treating physicians' opinions.  The Court accordingly addresses these two sections of Messina's Complaint together.

22

A treating physician generally garners greater weight under the social security regulations because "these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations."  20 C.F.R. 404-1527(c)(2).

Given the unique nature of a treating physician's opinion, such an opinion is generally "given 'controlling weight' as long as it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record.'"  *Burgess v. Astrue,* 537 F.3d 117, 128 (2d Cir. 2008) (quoting 20 C.F.R. § 404.1527(d)(2*)); see also Mariani v. Colvin*, 567 F. App'x 8, 10 (2d Cir. 2014) (holding that "[a] treating physician's opinion need not be given controlling weight where it is not well-supported or is not consistent with the opinions of other medical experts" where those other opinions amount to "substantial evidence to undermine the opinion of the treating physician").  Where a treating physician's opinion conflicts with other record evidence, it is "within the province of the ALJ" to determine which portions of the report to credit, and to what extent.  *Pavia v. Colvin*, No. 6:14-cv-06379 (MAT), 2015 WL 4644537, at 4 (W.D.N.Y. Aug. 4, 2015) (citing *Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002)).

In determining the amount of weight to give a treating physician's opinion, the social security regulations provide certain considerations:  "Generally, the

longer a treating source had treated [a claimant] and the more times [the claimant] has been seen by a treating source, the more weight [the ALJ] will give to the source's medical opinion."  20 C.F.R. 404-1527(c)(2)(i).  In addition, "the more knowledge a treating source has about [the claimant's] impairment(s), the more weight [the ALJ] will give the source's medical opinion."  20 C.F.R. 404-1527(c)(2)(ii).  In determining a treating physician's level of knowledge, the ALJ looks at "the treatment the source has provided and . . . the kinds and extent of examinations and testing the source has performed."  *Id.*  Further, "[t]he more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight [the ALJ] will give that opinion."  20 C.F.R. 404-1527(c)(3).

Messina's treating physicians for his spinal condition during the relevant time period were Dr. Patel and Dr. Druckemiller.  [*Id.* at 2; *see, e.g.*, Dkt. No. 7-8 at 253-58, 280 (Dr. Patel's treatment), *Id.* at 261-62 (Dr. Druckemiller's treatment).]  Although Messina experienced fluctuating pain throughout the relevant time period, on December 12, 2008, Dr. Druckemiler determined Messina "is a well-developed and nourished 40 year old male who is oriented . . . , alert and cooperative, [and] in no acute distress."  *Id.* at 261.  Dr. Druckemiller found "mild restricted ROM [range of motion] of the back" but that Messina "has normal gait, strength and coordination."  *Id.*  Dr. Druckemiller's December 12, 2008 opinion did not diagnose a permanently disabling condition; it found degenerative changes and "symptoms consistent with radiculopathy," but prescribed a course of action to address those conditions.  *Id.*  As of December 12, 2008, Messina's

degenerative spinal condition was to be treated with a back exercise program and moderate weight reduction, and surgery was only a future possibility if that treatment failed to improve Messina's condition. *Id.*

No treating physician during the relevant time period contradicted Dr. Druckemiller's assessment or otherwise asserted Messina's spinal condition constituted a disabling condition at that time. ALJ Alger appropriately relied upon Dr. Druckemiller's December 12, 2008 assessment when determining Messina was capable of the full range of light work during the relevant time period.

ALJ Alger also assigned "significant weight" to non-treating physician Dr. Kuslis's opinion of Messina's limitations due to his spinal condition. [Dkt. No. 7-3 at 17-18.] Dr. Kuslis identified mild limitations consistent with Dr. Druckemiller's assessment, and ALJ Alger found her opinion otherwise consistent with the medical record. [Dkt. No. 7-8 at 63-65.] ALJ Alger's reliance on both Dr. Kuslis and Dr. Druckemiller's medical assessments is supported by substantial record evidence. *Id.* at 17-18.

Messina specifically asserts ALJ Alger should have instead granted controlling weight to Dr. Bash's opinion, which assigned Messina more limitations in the ability to sit, stand, or walk for prolonged periods. [Dkt. No. 1 at 11-12.] The ALJ stated he gave Dr. Bash's opinion "some weight," but found it conflicted with medical records, which indicated that Messina's "condition improved such that he regained the ability to perform the full range of light work by December 31, 2008." *Id.*

25

In addition, Dr. Bash's treatment of Messina did not begin until after the relevant time period, further supporting the ALJ's decision to assign his opinion limited weight.  *See generally* 20 C.F.R. 404-1527(c)[10]; *Woodmancy v. Colvin*, 577 F. App'x 72, 75 (2d Cir. 2014).  In *Woodmancy*, the Court explained that "a treating physician's retrospective diagnosis is not conclusive" and an ALJ may afford less weight to such opinions after considering the examining and treatment relationship, supportability with medical evidence, consistency with the record, specialization of the examiner, and other relevant factors.  *Id.* at 75.  The *Woodmancy* Court upheld the ALJ's decision not to grant controlling weight to a retroactive opinion regarding the claimant's limitations where it contradicted record evidence.  *Id.* at 75.  ALJ Alger found Dr. Bash's opinion contradicted record evidence and, as he was not the treating physician during the relevant period, and he is not able to provide a "detailed, longitudinal picture of [Messina's] medical impairment(s)" or "unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or

---

[10] **20 C.F.R. 404-1527(c) states "Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations."  Subsection (c)(i) goes on to explain: "Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion. When the treating source has seen you a number of times and long enough to have obtained a longitudinal picture of your impairment, we will give the source's opinion more weight than we would give it if it were from a nontreating source."**

from reports of individual examinations."  20 C.F.R. 404-1527(c).  Accordingly, ALJ Alger was not required to give Dr. Bash's opinion controlling weight.

Further, Dr. Bash failed to identify a basis for his opinion, citing no medical evidence or specific diagnosis or disabling condition as the source of Messina's proposed limitations.  [Dkt. No. 7-8 at 669.]  Failure to do so further limits the weight attributable to Dr. Bash's opinion.  20 C.F.R. 404-1527(c)(3).   ALJ Alger appropriately weighed Dr. Bash's opinion less heavily than those of Dr. Druckemiller and Dr. Kuslis.

Turning to Messina's asserted mental disorders, Messina's primary treatment source during the relevant time was Dr. Fignar, his primary care physician, who prescribed mental health medication throughout 2008.  [*See, e.g.*, Dkt. No. 7-8 at 372.]  Dr. Patel also provided limited mental health assessments in 2008.  [*See, e.g.*, *id.* at 231.]  In addition, Dr. Cudrin and State psychiatric medical consultant Dr. Augenbraun submitted opinions regarding Messina's limitations due to his adjustment disorder.  [Dkt. No. 7-8 at 313; Dkt. No. 7-4 at 52-53.]  No treating or non-treating medical source opined that Messina had more than mild limitations due to his mental health during the relevant time period.  [*See, e.g.*, *id.* at 370 (August 1, 2008 assessment by Dr. Fignar indicating Messina's mood fluctuations, symptoms of depression and insomnia were "mostly resolved with treatment"); *id.* at 231 (December 1, 2008 assessment by Dr. Patel that Messina's depression level was two out of ten); *id.* at 313 (Dr. Cudrin's assessment that Messina's adjustment disorder results in "no more than a slight problem" with daily functioning, and his substance abuse was in remission); Dkt. No. 7-4 at 52-

27

53 (Dr. Augenbraun's assessment that Messina's restrictions due to his affective disorder are mild).]  ALJ Alger's determination that Messina had no disabling mental health condition during the relevant time period is appropriately consistent with all four medical sources.

Finally, regarding Messina's right shoulder labrum tear, ALJ Alger considered medical records from Dr. Belniak, the orthopedist who examined Messina's right shoulder and surgically repaired it in 2008.  [Dkt. No. 4-3 at 17 (citing "Exhibit 4F," Dr. Belniak's treatment notes, when discussing Messina's right shoulder condition and surgical repair).]  ALJ Alger also cited Dr. Kuslis' opinion, which discussed mild limitations due to Messina's shoulder condition as well as his spine condition (discussed above), in support of his determination that Messina's shoulder left him with the ability to perform light work during the relevant period.  *Id.* at 17-18.  The treating and non-treating medical sources agreed that by the close of the relevant time period Messina had no more than mild limitations due to his shoulder.  The ALJ appropriately relied on both decisions in determining Messina's shoulder condition did not prevent him from performing the full range of light work during the relevant time period.

The Court concludes that the ALJ appropriately weighed treating and non-treating medical sources in his decision in the RFC analysis and throughout his decision.  Messina's motion to reverse on these grounds is DENIED and the Commissioner's motion to affirm is GRANTED.

> **b.  Whether the ALJ properly evaluated Messina's symptoms**

Messina also asserts that "[t]he Administrative Law Judge's evaluation of the Plaintiff's symptoms, including pain[,] contradicts the objective medical and

28

other evidence." [Dkt. No. 1 at 6 (internal citations omitted).]  In support of this position, Messina quotes three excerpts from ALJ Alger's decision as evidence that the ALJ failed to fully consider certain record evidence.  *Id.* at 6-8.

An ALJ's decision must be supported by substantial evidence from the record, meaning "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009).  However, the ALJ "does not have to state on the record every reason justifying a decision."  *Brault v. Social Sec. Admin., Comm'r,* 683 F.3d 443, 448 (2d Cir. 2012).  "'Although required to develop the record fully and fairly, an ALJ is not required to discuss all the evidence submitted.'"  *Id.* (quoting *Black v. Apfel*, 143 F.3d 383, 386 (8th Cir. 1998)).  In addition, "[a]n ALJ's failure to cite specific evidence does not indicate that such evidence was not considered."  *Id.*

First, Messina quotes ALJ Alger's comment that "there insufficient evidence to issue a favorable decision from the period beginning May 10, 2008 through December 31, 2008.  I note that there is very little evidence that pertains to the relevant period, e.g., Exhibits 1F through 5F, 9F and 10F."  [Dkt. No. 1 at 6.] Messina and ALJ Alger agree that most of the medical records from Exhibits 1F through 5F, 9F and 10F pertain to the relevant time period.  *Id.*  However, Messina appears to disagree with ALJ Alger's characterization that those records are "insufficient . . . to issue a favorable decision."  *Id.*

The ALJ's decision explained why the record evidence from the relevant time period was insufficient to establish disability during the relevant time period. [Dkt. No. 7-3 at 7.]  As discussed elsewhere in this decision, ALJ Alger cited Dr.

Druckemiller's medical notes to conclude that Messina's back and left leg pain had by December 21, 2008 left him "well-developed and well nourished, fully oriented, alert and cooperative and in no acute distress," with "mild restricted range of motion of the back, but . . . a normal gait, with normal strength and coordination in the lower extremities."  *Id.* at 16-17.

Similarly, ALJ Alger considered Messina's right shoulder labrum tear, but emphasized post-operative medical notes indicating Messina's pain resolved and range of motion improved after his October 2008 shoulder repair surgery.  *Id.* at 17.

Finally, ALJ Alger considered Messina's mental health, emphasizing Messina's admission that Dr. Fignar's treatment "mostly resolved" any symptoms of mental illness by September 2008.  [*See, e.g.*, Dkt. No. 7-8 at 370.]

Messina does not specify any record evidence ALJ Alger failed to consider that would have altered his conclusion that there was insufficient evidence of a disability during the relevant time period.  In fact, the medical records Messina cites as pertaining to the relevant time period – Exhibits 1F through 5F, 9F and 10F – are the same exhibits ALJ Alger explicitly considered in his decision.  [Dkt. No. 1 at 7; Dkt. No. 7-3 at 7.]

The second passage from the ALJ's decision which Messina challenges summarizes Dr. Druckemiller's December 12, 2008 medical notes.  [Dkt. No. 1 at 7.]  Messina asserts ALJ Alger omitted a portion of Dr. Druckemiller's notes from that date stating: "[W]e've discussed all this with him. He will start a back exercise program and moderate weight reduction.  If he fails to improve surgery

might become a consideration.  It would have to include fusion, given the appearance of the scan." [Dkt. No. 1 at 8.]  Messina also notes that he did eventually have the contemplated spinal surgery. *Id.*

ALJ Alger was not required to quote or reference every portion of the medical record on which he relied in his decision.  *Brault,* 683 F.3d at 448.  It is clear ALJ Alger considered the entirety of Dr. Druckemiller's December 12, 2008 medical notes, as he cites them heavily in his decision (and the notes are only two pages long).  [Dkt. No. 7-3 at 16-17; Dkt. No. 7-8 at 261.]  In addition, ALJ Alger explicitly considered the fact that Messina eventually had the spinal surgery Dr. Druckemiller contemplated.  *Id.* at 15.

Further, even if ALJ Alger had not considered Dr. Druckemiller's suggestion that Messina start a back exercise program and moderate weight reduction, or his note that surgery "might become a consideration" if Messina failed to improve, the omission would have been harmless error.  The omitted text indicates that as of December 2008, Messina's spinal condition would be moderated with exercise and weight reduction, and that surgery was not yet necessary, and might never become necessary.  That text is not inconsistent with ALJ Alger's conclusion that as of December 2008, Messina's spinal condition was not a disabling condition within the meaning of the social security regulations.

Lastly, Messina quotes a portion of the ALJ's decision stating:

> [T]he evidence of record does not support a finding that the claimant had significant mental functional limitations during the relevant period.  The record does not show that he was receiving ongoing mental health treatment, and this reflects poorly on the credibility of his statements when he alleges significant mental functional limitations during the relevant period.

[Dkt. No. 1 at 8 (citing Dkt. No. 7-3 at 9.]

Messina asserts he was being treated for anxiety, depression and insomnia throughout the relevant period.  [Dkt. No. 1 at 8-9.]  Specifically, Messina notes that he completed a "screening for mood disorder" questionnaire for Dr. Fignar, his primary care physician, on May 16, 2008, and that as a result Dr. Fignar "diagnosed" Messina with bipolar affective disorder.  *Id.*

Messina also asserts he saw Dr. Cudrin, a psychologist, for mental health treatment during the relevant period.  *Id.* at 9 ("After visiting Dr. Fignar, the Plaintiff, for the first time, visited Jay M. Cudrin, PHD, for mental health treatment.")  However, the medical record Messina cites to support that contention is an August 23, 2012 form Dr. Cudrin completed describing Messina's (mild) limitations due to adjustment disorder.  *Id.* at 9 (citing Exhibit 7F in the medical record).  There are no earlier medical notes in the record indicating Dr. Cudrin treated Messina during the relevant time period.  The only record evidence of mental health care in 2008 is Dr. Fignar's questionnaire and resulting prescriptions for anxiety and depression medication, along with Dr. Patel's periodic one-through-ten assessments of Messina's depression level during his pain-management visits.  *See, e.g.*, Dkt. No. 7-8 at 231 (December 1, 2008 medical notes rating Messina's depression level at two out of ten).

ALJ Alger specifically considered Dr. Cudrin's 2012 mental health report [Dkt. No. 7-3 at 13], and repeatedly cited to Dr. Fignar's reports throughout the decision, although he did not reference them specifically in support of his statement that "the evidence of record does not support a finding that the

32

claimant had significant mental functional limitations during the relevant period." *Id.* at 18.  As stated above, ALJ was not required to specifically cite all evidence relied upon throughout his decision.  *Brault,* 683 F.3d at 448.

Even if ALJ Alger had not considered Dr. Fignar's questionnaire and resulting mental health prescriptions, that omission would constitute harmless error.  Dr. Fignar's medical notes indicate that by September 2008, Messina's feelings of instability, depression, and insomnia had subsided, and that Messina remained stable through the remainder of the relevant time period.  [Dkt. No. 7-8 at 370, 372.]  That evidence supports ALJ Alger's finding that Messina did not suffer from a disabling mental health condition during the relevant time period, and would not have compelled a different conclusion.

Finally, the Court interprets Messina's last quotation (*see supra* p. 31) as questioning ALJ Alger's determination that the lack of evidence of mental health treatment in the record "reflects poorly on the credibility of his statements when he alleges significant mental functional limitations during the relevant time period."

In determining credibility, the ALJ must determine if the claimant's asserted symptoms could "reasonably be accepted as consistent with the objective medical evidence and other evidence."  20 C.F.R. §§ 404.1529(a), 416.929(a).  If the objective evidence does not support the plaintiff's testimony with respect to functional limitations, the ALJ retains discretion to determine the claimant's credibility by considering the factors set forth in 20 C.F.R. §§

33

404.1529(c)(3), 416.929(c)(3).[11]  *Skillman,* 2010 WL 2541279, at *6; *see also Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (the ALJ "may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence of record"). The factors to be considered are (i) the claimant's daily activities; (ii) the location, duration, frequency, and intensity of the claimant's pain; (iii) any precipitating or aggravating factors; and (iv) the type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to alleviate their pain or other symptoms.  *Id.* at *6 (citing 20 C.F.R. §§ 404.1529(c)(3)(i)-(iv), 404.929(c)(3)(i)-(iv)).

The ALJ's "finding that the witness is not credible must . . . be set forth with sufficient specificity to permit intelligible plenary review of the record." *Williams on Behalf of Williams v. Bowen*, 859 F.2d 255, 260-61 (2d Cir. 1988).  The "ALJ's credibility determination is generally entitled to deference on appeal." *Selian v. Astrue*, 708 F.3d 409, 420 (2d Cir. 2013).

ALJ Alger found Messina's testimony regarding his mental health not credible for two reasons.  First, he found Messina's "presentation at the hearing did not demonstrate marked or severe or debilitating mental symptoms or mental functional limitations."  [Dkt. No. 7-3 at 18.]  Second, ALJ Alger noted the "record does not show that he was receiving ongoing mental health treatment."  *Id.*  ALJ Alger articulated the specific reasons for his credibility determination which was

---

[11]  These factors include daily living activities, any medications and treatments and their efficacy, and any other relevant factors. 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3).

supported by the predominant evidence in the case record.  His reasoning was sufficiently specific to make clear the weight given to Messina's statements and the reasons for that weight.

Accordingly, Messina's motion to reverse for failure to fully evaluate the medical evidence is DENIED; the Commissioner's motion to affirm is GRANTED.

IV.   Conclusion

For the reasons set forth above, Messina's Motion for an Order Reversing or Remanding the Commissioner's Decision [Dkt. No. 15] is DENIED and the Commissioner's Motion to Affirm that Decision [Dkt. No. 16] is GRANTED.

It is so ordered this 6th day of February 2017, at Hartford, Connecticut.

_____/s/_____

Vanessa L. Bryant, U.S.D.J.

35